**Kevin JETER, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner, Social Security Administration, Defendant.**

No. CIV.A. 01–6162.

United States District Court, E.D. Pennsylvania.

Jan. 2, 2003.

Eric J. Fischer, Elkins Park, PA, for Plaintiff.

Nicholas Cerulli, Social Sec. Admin., Office of Gen. Counsel, Philadelphia, PA, for Defendant.

## MEMORANDUM

### EDUARDO C. ROBRENO, District Judge.

This is an appeal from a final decision of the Commissioner of the Social Security Administration denying plaintiff Kevin Jeter's claim for supplemental security income (SSI). Before the court are plaintiff's motion for summary judgment seeking that the court reverse the Commissioner's denial of benefits on the merits, or, in the alternative, that the court vacate the denial of benefits and remand the matter for a supplemental hearing for the purpose of taking additional testimony from medical expert Dr. Margaret Friel. Also before the court is a Report and Recommendation of the Magistrate Judge recommending that the court grant the defendant's motion and deny the plaintiff's motion.

Plaintiff has raised only one objection to the Magistrate Judge's Report and Recommendation, contending that the Magistrate Judge failed to take proper account of the fact that Dr. Friel's opinion was based on a record that, as of the time of her testimony, was incomplete. Therefore, plaintiff contends that he is entitled to a supplemental hearing to afford Dr. Friel an opportunity to review his post-hearing evidentiary submissions.

For the reasons that follow, the court will adopt the Report and Recommendation of the Magistrate Judge, and will grant defendant's motion for summary judgment. The court finds, contrary to plaintiff's assertion, that there is substantial evidence to support the Commissioner's denial of supplemental security income.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Kevin Jeter is a 48 year-old male with a high school education and past work experience as a maintenance worker or janitor. Tr. 128, 141. He alleges that he became disabled as of March 1, 1996 because of anxiety, nervousness, depression and a learning disability. Tr. 137.

Plaintiff's application for SSI was denied both initially and upon reconsideration. Tr. 107–10, 118–21. He then requested a hearing before an Administrative Law Judge (ALJ). A hearing was held on October 29, 1997 at which plaintiff, represented by counsel, testified, along with a vocational expert, and medical expert Dr. Margaret Friel. In a decision rendered on September 2, 1998, the ALJ found that although the plaintiff has "severe generalized anxiety disorder and depression," this condition does not prevent him from performing his past work as a janitor. Tr. 18–26. The ALJ's findings became the final decision of the Commissioner when the Appeals Council denied Jeter's request for review on October 15, 2001. Tr. 9–10. Plaintiff appealed that decision to this court.

## II. DISCUSSION

### A. "Substantial Evidence" Standard

The role of the court is to determine whether the Commissioner's findings of fact are supported by "substantial evidence." 42 U.S.C. § 405(g); *Jesurum v.*

*Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir.1995) (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988)). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Jesurum*, 48 F.3d at 117 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "It is less than a preponderance of the evidence, but more than a mere scintilla." *Id.* (citing *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420).

The search for substantial evidence "is not merely a quantitative exercise." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Rather the "administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981), *reh'g denied*, 650 F.2d 481 (3d Cir.1981). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent*, 710 F.2d at 114.

The court's review of the Magistrate Judge's Report and Recommendation is de novo. 28 U.S.C. § 636(b). Therefore, the court "may accept, reject or modify, in whole or in part," the Magistrate Judge's findings and recommendations. *Id.* In considering claimant's objection to the Magistrate Judge's ruling, the court has independently reviewed the entire record, including the Report and Recommendation, the ALJ's written decision, the transcript of the hearing, the hearing exhibits, relevant correspondence, and relevant documents submitted after the hearing.

**B. Establishing Eligibility for SSI**

In order to qualify for SSI, a claimant must show that he suffers from a disability as under the Social Security Act, which defines "disability" as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ... [The impairment must be so severe that the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

The Commissioner has established a five-step inquiry for determining whether a claimant is eligible for disability benefits under the Act. To prevail, a claimant must establish (1) that he is not engaged in substantial gainful activity, and (2) that he suffers from a severe medical impairment. *See Jesurum*, 48 F.3d at 117 (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). If the claimant shows these two elements, the Commissioner determines (3) whether the impairment is listed by the Secretary as one creating a presumption of disability. *Id.* If the claimant's medical impairment is not "listed," the claimant bears the burden of proving that (4) the impairment nonetheless prevents him from performing the work that he has performed in the past. *Id.* The relevant inquiry is "whether the claimant retains the residual functional capacity to perform [his] past relevant work," *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir.2001). If the claimant satisfies this burden, the Secretary must grant him benefits unless the Secretary can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Jesurum*, 48 F.3d at 117 (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985)).

### C. Jeter's Medical and Vocational History

In this case, the ALJ determined, at step four of the inquiry, that Jeter retained the residual functional capacity to carry out his past work as a janitor. The relevant evidence in this case consists of medical reports and testimony, as well as records of performance in school and past job performance. The evidence is summarized below.

Robert Broderick, Ph.D., conducted a psychological evaluation of Jeter on December 13, 1994. After IQ testing, Broderick concluded that Jeter's level of intellectual functioning fell within the low-average range; Jeter had IQ scores of 79 verbal, 82 performance, and 80 full scale. Tr. 296. When Broderick evaluated Jeter's personality functioning, he noted that Jeter manifested a high level of anxiety and impulsivity that hampered his performance during his psychological evaluation, and had difficulty concentrating and listening. Tr. 297. Assessing Jeter's complaints of intermittent depression, Dr. Broderick concluded that Jeter fell within the normal limits under the Beck Depression Inventory and the Beck Hopelessness scale. Tr. 297. Dr. Broderick stated that Jeter was "an excellent candidate for individual psychotherapy," and recommended "a therap[eu]tic approach which combines cognitive therapy techniques with relaxation exercises." Tr. 297.

Charles Holtz, M.S.S., a psychotherapist at the Joseph J. Peters Institute, evaluated Jeter on September 25, 1995. He described Jeter as fully oriented, but mildly depressed. Tr. 280. However, Jeter denied having any two week episodes of depression in his past, and denied that he was having problems with concentration, sleep, or current or past suicidal thoughts. Tr. 280. Mr. Holtz noted that Jeter showed signs of being mildly to moderately anxious, and complained of worries that made him "psychologically" tired and sometimes disturbed his sleep. Tr. 280. Jeter reported sudden anxiety, accompanied by headaches and heart palpitations, that occurs when he is in crowds, and nightmares about his childhood molestation. Tr. 281. Mr. Holtz observed that Jeter showed no evidence of a thought disorder, and denied any current or past auditory or visual hallucinations, as well as episodes of high energy or paranoia. Tr. at 281.

Mr. Holtz diagnosed Jeter with generalized anxiety disorder, dysthymia, post traumatic stress disorder, panic disorder without agoraphobia, and sexual dysfunction NOS. Tr. 281. However, he concluded that Jeter was "a good candidate for group treatment for sexual offenders." Tr. 281.

The record also contains an October 25, 1995 evaluation conducted by Joyce Summer, Ph.D., who had treated Jeter for approximately one year. At the time of this evaluation, Jeter was in individual therapy, was on the waiting list for group therapy, and had been prescribed no medications. Tr. 217. Dr. Summer noted that Jeter was "very paranoid" and "continues to experience panic attacks" and had concentration and impulse control problems. Tr. 217–18. However, Dr. Summer also stated that Jeter's "mood is described as OK. He does not exhibit excessive mood swings and . . . [t]here have been no reports of severe withdrawal . . . The patient continues to have depression but in ebs [sic] and tides." Tr. 218. Dr. Summer did not state an opinion on Jeter's prognosis, but stated that Jeter had "shown progress in therapy in that he is beginning to . . . take control of his actions." Tr. 218.

Dr. Katie Roby conducted a psychological disability evaluation of Jeter on October 28, 1996. Unlike Jeter's other evaluators, Dr. Roby noticed no apparent

deficiencies in Jeter's attention and concentration, and, although she assessed his intelligence as below average and found that his short term memory was impaired, she also found that Jeter was able to comprehend simple commands. Tr. 269. Noting Jeter's claims of an imaginary friend and feelings that everyone was out to get him, Dr. Roby diagnosed Jeter with a depressive disorder. Tr. 269–70. Ultimately, however, Dr. Roby opined that Jeter's prognosis was "good." Tr. 271.

In her psychiatric activities assessment form, Dr. Roby indicated that Jeter was able to communicate clearly and had the ability to carry out simple instructions. Tr. 273–74. She described as "poor to fair" Jeter's ability to sustain a routine, make decisions, adapt to change, and maintain regular attendance. Tr. 274.

Jeter was again evaluated on November 11, 1997 by Dr. Gerald Streets of the Community Council for Mental Health and Retardation. Dr. Streets diagnosed Jeter with major depression, and explained that Jeter had "marked psychological stressors including family separation, sexual abuse perpetration, unemployment and subjective sense of inadequacy. He has major stigmata depression and post traumatic symptomology with panic episodes." Tr. 308. However, Dr. Streets opined that Jeter's prognosis was "fair" and recommended continued group and individual therapy, along with medication management. Tr. 308.

At the time of his administrative hearing, Jeter testified that he was undergoing group counseling on a weekly basis at the Joseph J. Peters Institute as a condition of parole for child molestation. Tr. 57. He was taking Serzone for his depression, Tr. 59, and complained that he was unable to work because of headaches, nightmares, and the inability to get over being molest-

ed himself as a child. Tr. 63. Jeter testified that he tried looking for jobs as a janitor, but was continually refused employment, Tr. 68–70, and that his daily activities as of the time of the hearing included sleeping a lot and watching television or listening to music. Tr. 65–67.

Reports from the Joseph J. Peters Institute, one dated January 1, 1997 and the other dated July 1, 1997, indicate that Jeter was diagnosed with dysthymia, post traumatic stress disorder, panic disorder and sexual dysfunction. Both reports describe Jeter's prognosis as excellent, and recommended additional treatment lasting at least one year. Tr. 264–67.

Dr. Margaret Friel, a psychiatrist, testified as a medical expert at Jeter's hearing. Dr. Friel stated that whereas Jeter's impairments together are severe, they did not meet or equal any listing, and then described Jeter's activities of daily living and socialization as "moderately limited." Tr. 76, 79–80. She found that, as of the time of the hearing, although Jeter could not carry out detailed instructions, his abilities in the following areas would be moderately, but not be significantly, limited by his mental condition: (1) carrying out short or simple instructions, (2) maintaining attention and concentration for extended periods, (3) performing within a schedule, (4) working without special supervision, (5) making simple work-related decisions, (6) completing a normal work day and work week, (7) interacting appropriately with the general public, (8) asking simple questions and requesting assistance, (9) relating to supervisors and getting along with co-workers, (10) responding appropriately to changes in the work setting, (11) being aware of normal hazards, (12) traveling in unfamiliar places, and (13) setting realistic goals and plans independently of others. Tr. 79–80.

Based on Jeter's moderate limitations, Dr. Friel opined that he would "be more comfortable psychiatrically in areas where supervision was at a minimum." Tr. 81. She also found that medicating Jeter with Serzone to be an appropriate treatment, and predicted that the sleepiness of which Jeter complained in connection with the medicine would decrease over time with regular use. Tr. 81–82.

Finally, a vocational expert testified, based on a review of hearing testimony, that Jeter could return to janitorial work. Tr. 91–101.

After the hearing, Jeter supplemented the record with voluminous submissions on his troubled employment history, and with the November 11, 1997 evaluation by Dr. Gerald Streets.

### D. Application of the Substantial Evidence Standard

■ Based on the foregoing evidence, all of which appears prominently in the ALJ's final report, the ALJ concluded that Jeter had established that he suffers from "severe generalized anxiety disorder and depression," that "he requires work with minimal direct supervision ... with one to two step simple directions ... [and] limited interactions with coworkers and supervisors," and that janitorial work dovetailed with Jeter's restrictions. Tr. 25. Therefore, the ALJ found that Jeter had not sustained his burden of proving that he lacked the ability to carry out his former work. *See Fargnoli v. Massanari,* 247 F.3d 34, 39 (3d Cir.2001).

In his sole objection to the Magistrate Judge's Report and Recommendation, Jeter contends that Dr. Margaret Friel, the medical expert who was engaged by the ALJ to testify at Jeter's hearing, testified as to her findings based on a woefully incomplete record, and that the lack of a comprehensive record caused Friel to un-

derestimate the severity of Jeter's impairments. Pl. Jeter's Written Objections to the U.S. Magistrate Judge's Report and Recommendation, at 3–4. Jeter states that, after Jeter's administrative hearing, he filed "literally hundreds of pages of evidence, related both to psychiatric treatment and plaintiff's dysfunctional employment history." *Id.* at 4. Jeter argues:

[The Report endorsed] the government's adoption of Dr. Friel's assessment of mental restrictions, even though the assessment is *not* (as claimed by the ALJ) premised upon 'a compilation of all the other reports ....' To the contrary, the record as a whole has not been evaluated *in full* by any expert. This is not consistent with defendant's responsibilities pursuant to long established Third Circuit caselaw, at least since *Cotter v. Harris,* 642 F.2d 700 (3d Cir.1981).

*Id.* Accordingly, Jeter contends that the Commissioner had the obligation to seek further clarification from Dr. Friel at a supplemental hearing, in light of his post-hearing evidentiary submissions, and, in substance, that any finding that relies on Friel's testimony in any way is therefore not based on substantial evidence. *See id.* at 4–5. The court does not agree.

In *Cotter v. Harris,* 642 F.2d 700 (3d Cir.1981), *reh'g denied,* 650 F.2d 481 (3d Cir.1981), the Third Circuit emphasized the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* at 705 (quoting *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979)) (emphasizing that a court may not say that the Secretary's decision is supported by substantial evidence "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits"). The case does not stand for the proposition that the ALJ must engage an expert to evaluate the record as a whole in order to comply with

statutory duties. Rather, the focus of the *Cotter* decision was on compelling the ALJ to provide "not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Id.* Indeed, the court states that "when the medical testimony or conclusions are conflicting, the *ALJ* is not only entitled but required to choose between them ...." *Id.* (emphasis supplied).

It is true, as Jeter's objection states, and, as an examination of the transcript of the evidentiary hearing does reveal, that the record reviewed by Dr. Friel in preparation for the hearing, was supplemented after the hearing with appropriate leave of the ALJ, by the plaintiff.[1] In fact, the ALJ left the record in Jeter's case open for approximately 30 days after the conclusion of the hearing.[2] During this period, Jeter submitted the report of Dr. Gerald Streets and voluminous documentation of his troubled employment history, starting in the mid-seventies.

The fact that the record was not "complete" for Dr. Friel's review, i.e., Jeter made additional submissions after Dr.

Friel testified at the hearing, does not fatally undermine Dr. Friel's findings, the validity of her opinion as a medical expert, or the overall substantiality of the record on which the ALJ relied. First, Dr. Friel had examined a significant amount of information by the time of Jeter's hearing. Before her at the time of the hearing were Dr. Summer's diagnosis of an anxiety disorder in September 1995, and a psychiatric evaluation from October 1996,[3] and updated psychotherapy records through the summer of 1997. Tr. 75, 77. In response to concerns raised by plaintiff's counsel about the completeness of the record, the ALJ specifically asked Dr. Friel whether there was sufficient information and objective evidence in the exhibit file to enable her to make a medical judgment as to Jeter's psychiatric status. Dr. Friel answered in the affirmative. Tr. 74.

Second, and most significantly, regardless of the state of the record at the time that Dr. Friel issued her opinion, the record was completed by the time that the ALJ made her final determination of Jeter's eligibility for SSI. Therefore, to the extent that the supplementation of the rec-

---

1. During her testimony, Dr. Friel stated, that "we do not have current evidence. So that's ... a major handicap. If I can ... testify based on the evidence in the file?" Tr. 76–77. One of the attorneys responded that "we do have some current evidence, Judge. I know the Doctor just saw it for a brief moment, but we do have updated psychotherapy records that go all the way up into at least the summer [of 1997]." Tr. 77. The ALJ then confirmed, that "[Dr. Friel] saw those." Tr. 77.

   At another point, Dr. Friel stated that she had not reviewed the report from the "treating psychiatrist." The ALJ responded that "if and when that comes in ... if I think it's appropriate, I will send it ... as an interrogatory ...." Tr. 77.

   Plaintiff's counsel asked Dr. Friel, "if in fact we were able to get additional documentary evidence in line with what the Judge and I have been discussing during the course of the

hearing, could that potentially lead to your reassessment of my client's functionability to be even more severe?" Tr. 83. Dr. Friel responded "absolutely." Tr. 83.

2. This was ostensibly to allow plaintiff's counsel to obtain records of the psychiatric treatment that Jeter allegedly received while in prison between 1990 and 1994. Tr. 47–48. There is also some mention that a mental capacity to perform work form filled out by a Dr. Pensky was missing as of the time of Jeter's hearing. Tr. 48–50. However, after the hearing, plaintiff's counsel submitted a psychiatric evaluation conducted by Dr. Gerald Streets, also of the Community Council for Mental Health and Mental Retardation.

3. At the hearing, Dr. Friel identified this document only by its date. However, the date suggests that the report to which Dr. Friel referred was the report of Dr. Katie Roby.

ord undermines any of Dr. Friel's conclusions, a fact not specifically developed by claimant, any conflict between the two would go to the weight to be accorded to Dr. Friel's testimony, but would not command a remand. The issue is not whether the record was complete at the time that Dr. Friel issued her opinion, but rather whether the ALJ made her decision on the basis of a complete record. Before issuing a final decision on Jeter's claim, the ALJ took into account reports of Jeter's school and job performance, and psychological and psychiatric evaluations submitted by Jeter as supplementation of the record, including the opinion of Dr. Streets, who assessed Jeter's condition in November 1997. Dr. Streets diagnosed Jeter with "major depression" accompanied by "marked psychological stressors," [4] but gave him a prognosis of "fair." Tr. 307–08. To the extent that Dr. Streets' medical opinion could be viewed as conflicting with that of Dr. Friel and others, the ALJ was required to choose which view to adopt, and to provide her reasons for doing so. *See Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981).

 In this case, the ALJ's decision makes clear that she did not view Dr. Street's report and his diagnosis of major depression as inconsistent with the findings of other doctors who evaluated Jeter. To the extent that Dr. Street's diagnosis could potentially be viewed as inconsistent with others that refer only to the existence of depression, the significance of this discrepancy is undermined by the "fair" prognosis, of which the ALJ took note. Tr. 23. As set forth in detail above, those treating and evaluating Jeter, including Dr. Broderick, Dr. Roby, and therapists at the Joseph J. Peters Institute, freely acknowledge that Jeter has mental limitations, but consistently describe his prognosis as ex-

cellent or good with continued treatment. A "fair" prognosis is not fundamentally in conflict with these findings. In addition, Dr. Streets makes no comment on whether Jeter's condition would render him unable to perform basic work-related activities for the twelve month statutory period, and, thus, Dr. Streets' evaluation did not undercut Dr. Friel's conclusions that Jeter's mental condition moderately limited his abilities to perform basic job functions. Thus, there is substantial evidence on the record to support the ALJ's conclusion that "the medical records fail to support the claimant's testimony of totally disabling mental disorders." Tr. 23.

### III. CONCLUSION

For the foregoing reasons, the court adopts and approves the Report and Recommendation of Magistrate Judge Smith. Summary judgment is granted in favor of defendant, Commissioner of Social Security, and against plaintiff, Kevin Jeter.

---

**4.** Streets noted that Jeter had longstanding depression that had become more severe in

September 1997 after Jeter failed a GED prep course.