Ella **WILLIAMS**

v.

Margaret M. **HECKLER.**

**Civ. A. No. 84–0393.**

United States District Court,
E.D. Pennsylvania.

Feb. 1, 1985.

Jess Leventhal, Langhorne, Pa., for plaintiff.

Richard J. Stout, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

Presently before the court are the objections of Ella Williams ("plaintiff") to the Report and Recommendation ("Report") of Magistrate Naythons which upheld the final decision of the Secretary of Health and Human Services denying the plaintiff's claim for surviving child's benefits under the Social Security Act. After considerable review of the record compiled in the administrative proceedings and the legal conclusion which comprised the basis of the magistrate's decision, the court finds that the findings of fact upon which the Administrative Law Judge ("ALJ") based his decision were not "supported by substantial evidence". *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983). Summary Judgment on this matter will be granted in favor of the plaintiff.

The plaintiff has taken exception to the report on two grounds. First, she argues that the ALJ overlooked a pertinent statute governing the key issue in this matter, namely, what evidentiary standards should be used to determine if her child was the result of the union between Floyd Briggs ("wage earner") and herself. Second, plaintiff contends that the magistrate was in error in not finding that the evidence presented was "clear and convincing" to show that the deceased wage earner fathered her child.

### A. *The Law*

In reviewing the Secretary's decision, a district court should uphold a final determination of the Secretary to deny benefits if the findings of fact upon which the decision was based is supported by substantial evidence. *Kent v. Schweiker, supra.* Substantial evidence has been defined as "such relevant evidence as a reasoning mind might accept as adequate to support a con-

clusion." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). The Social Security Act provides for insurance benefits to be paid to the children of a deceased "insured individual". 42 U.S.C. § 402(d)(1). The act further defines who is the child of the "insured individual". In this instance, since the child was born out-of-wedlock, the act directs the Secretary to examine the state law that would be applied to determine the devolution of intestate personal property by the courts of the state in which the deceased wage earner was domiciled at the time of his death. Mr. Briggs was domiciled in Pennsylvania. The Pennsylvania intestate law, 20 Pa.C.S.A. § 2107(c)(1)–(c)(3), prescribes three ways a person born out-of-wedlock may prove the identity of his father.

(c) Child of father—For purposes of descent by, from and through a person born out of wedlock, he shall be considered the child of his father when the identity of the father has been determined in any one of the following ways:

. . .

(1) If the parents of a child born out of wedlock shall have married each other.

(2) If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

20 Pa.C.S.A. § 2107.

Subsection (c)(1) is inapplicable to the facts at hand. The Secretary found that the plaintiff failed to present evidence that would satisfy the requirement of subsection (c)(2). Specifically, it was determined that (1) Floyd Briggs did not openly hold the child out to be his own within the community-at-large and (2) that Floyd

Briggs did not provide support for the child.

Section 2107(c)(2) requires that the plaintiff come forward with "clear and convincing evidence." The requirements of subsection (c)(2) are written in the conjunctive and were the plaintiff to prove only one of the two elements, then her claim must fail.

The clear and convincing standard is more rigorous than a mere presumption of the evidence. Pennsylvania tribunals have yet to articulate a standard as to what constitutes clear and convincing evidence under § 2107(c)(2) and (c)(3); however, in passing upon this standard in interpreting estate law, the Supreme Court of Pennsylvania defined clear and convincing evidence as "testimony that is clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In Re Trust Estate LaRocca*, 411 Pa. 633, 640, 192 A.2d 409 (1963). Although it may appear from the court's language that a fact finder has virtually no room for doubt, the clear and convincing standard should not be equated with the beyond a reasonable doubt standard employed in criminal proceedings. The clear and convincing standard is greater than a preponderance of the evidence but less than that required by beyond a reasonable doubt.

With the applicable legal standards defined I will now review the facts presented during the administrative hearings.

B. *Facts*

The decision of the ALJ is primarily based upon the testimony given at the administrative hearing. The facts reveal the following:

Floyd Briggs was a resident of the West Oak Lane section of Philadelphia. He was married and the father of three children at the time of his death in 1981. His wife was unaware, prior to receiving notice of the hearing, of the existence of Albert, the plaintiff's child. Mr. Briggs was employed as a manager at a pawn shop and check cashing store located approximately 15 miles from where he lived. Mrs. Briggs testified that she did not associate with her husband's co-workers, nor did the workers at the pawn shop visit her and her husband at their residence. There was no evidence to indicate that anyone from the West Oak Lane community was aware that Floyd Briggs fathered a child outside of his marriage.

The plaintiff testified that she met Floyd Briggs at the pawn shop. Her family was familiar with him from using the services of the store. The couple began dating in October, 1977. (Tr. 43) One of their dates involved traveling to Baltimore with Floyd's co-worker, Robert Rosensweig. (Tr. 43) Shortly after they began dating, Ms. Williams became pregnant. She testified that Floyd wanted her to have an abortion. (Tr. 15) Mr. Rosensweig corroborated this fact by relating that Floyd said to him "he would take care of the abortion for her, and make it worth her while if she would have the child aborted." (Tr. 45) The plaintiff stated that Floyd was very unhappy about the pregnancy because he didn't want the burden of supporting two families. Mrs. Briggs was also pregnant at the same time with their third child. Floyd and the plaintiff did not live together and after learning of her pregnancy, he attempted to keep their contact to a minimum. During the nine months of pregnancy, she saw Floyd only four times. After the child's birth in July, 1978, she began to receive support payments from him. (Tr. 16) These payments were voluntary in the sense that plaintiff did not file a paternity action in Family Court. The birth certificate of the child lists as the father, Floyd Bricks. Plaintiff explained the discrepancy in the last name by stating that she only learned the proper spelling of Floyd's last name upon seeing it in the obituary column. Plaintiff did not complete her high school education.

The direct contact between Ms. Williams, Floyd and the child was very limited. The four or five times that mother and son visited the pawn shop were unpleasant experiences for Floyd Briggs. Mr. Rosensweig testified that the other employees

would tease Floyd saying how much the child looked like him. (Tr. 22) When these co-workers directly confronted Floyd about the child, he remained silent but did not deny it.

Ms. Williams also told of bi-weekly support payments received from Floyd. She stated that she would either pick them up at the store or Floyd would drop them off at her house. A close examination of her testimony reveals that the payments were less than regular. Mr. Rosensweig testified of seeing Floyd hand bank envelopes to Ms. Williams. He also said that Ms. Williams' brother would stop in the store, ostensibly to pick up the payments. Ms. Williams' sister also testified to both picking up payments at the store and seeing Floyd visit the house where she and her sister were living. The last person to testify in plaintiff's behalf was a resident of the neighborhood where the pawn shop was located. He stated that Floyd had once indicated to him that he had a child by the plaintiff. (Tr. 53)

It was against this factual background that the Secretary held that the plaintiff failed to satisfy the two prong requirement of § 2107(c)(2). The court finds that this holding cannot be substantially justified by the record. The court will examine each requirement of § 2107(c)(2) separately.

C. *Discussion*

The first prong of § 2107(c)(2) requires a finding that the father held the child out to be his own. As to this point, the ALJ's focus was far too broad and consequently diluted relevant evidence that leads to a reasonable conclusion of the child's parentage. The ALJ held there was a paucity of evidence showing Floyd Briggs openly held Albert out to be his own within the community-at-large. (Tr. 72) The community-at-large included not only the neighborhood where the pawn shop was located, but also the West Oak Lane community where Floyd resided.

The court believes that the ALJ was incorrect in not limiting the inquiry to only the community shared by the wage earner and the plaintiff. I do not believe that there is any inherent value in including in the inquiry the West Oak Lane community. The two communities are located within the City of Philadelphia whose population exceeds 1.5 million. The distance between them is substantial. They are distinctive neighborhoods in almost all aspects and separated by approximately 15 miles. The evidence, as the ALJ correctly noted, points to the fact that Floyd Briggs attempted to keep from the public the fact of his being the boy's father. Common sense explains why the West Oak Lane community may not have known of this child. The plaintiff never visited Floyd at his home. This is not an insightful fact in relation to Floyd's family situation. Mrs. Briggs was pregnant with child and knowledge of Ms. Williams could only cause embarrassment and humiliation to his family. The test is whether the community that was mutually shared by Mr. Briggs and Ms. Williams believed that he had fathered the child. This community primarily includes the workers at the pawn shop and persons from the neighborhood where the shop was located.

The testimony of a disinterested Mr. Rosensweig conclusively establishes that both he and his co-workers had reason to believe that the child was Floyd's. The ALJ did not comment upon the testimony of Robert Rosensweig in which he stated that Floyd had expressed to him a desire to have the plaintiff undergo an abortion. The inescapable conclusion drawn from this inference is that Ms. Williams was with his child. Mr. Rosensweig cannot be characterized as an interested party. He is not related to the plaintiff and has no vested interest in the outcome of this matter. Further testimony from this disinterested witness revealed that Floyd's co-workers were under the impression that the child was Floyd's. The "teasing" by his co-workers, which was witnessed to by Mr. Rosensweig, and corroborated by Ms. Williams, infuriated Floyd enough to have Ms. Williams refrain from bringing the child to the shop. The accusations by his fellow workers was never denied by Floyd. The office workers

were led to believe that Floyd was the father of Albert. It may well be that Floyd would have been unable to stop the persistent accusations by his co-workers by verbally denying he fathered the boy, but it is quite evident that his silence was interpreted by the pawn shop community as something less than a denial. The ALJ gave only scant comments upon the testimony of a second disinterested witness to whom Floyd had once stated that the plaintiff had a child by him. The ALJ found this testimony incredulous because the witness could not remember what year the wage earner had died. The ALJ was present and could observe the demeanor of the witness yet the record does not reveal anything inherently implausible about the witness' testimony. The testimony was from a person who holds no stake in the outcome. The court fails to see how such testimony can be cast as "self-serving".

Perhaps it is that each piece of evidence, if viewed separately, would not carry enough weight to clearly and convincingly decide the issue in favor of the plaintiff. Yet, when the evidence is received as a whole, it indicates clearly that in the limited community shared by the parties, the consensus was that Floyd was the father of Albert.

Section 2107(c)(2) was written in the conjunctive and therefore Ms. Williams must prove both parts of the statute to recover. The second requirement is a showing that the father provided support for the child. The ALJ concluded that the evidence was not clear and convincing to show that Floyd provided support. (Tr. 7) The conclusion that "evidence of contribution is limited to vague, uncorroborated, self-serving statements" (Tr. 6) is premised on the limited testimony provided by plaintiff's family. Testimonial evidence provided by a member of one's family is not per se unreliable. It should not be cloaked in the mantle of "self-serving" because it is uttered from the mouth of a loving sibling. The ALJ observed that the testimony of Ms. Williams and her brother and sister was conflicting as to the frequency of support payments. I agree that the record does not

establish that there were regular bi-weekly payments during the three years encompassing the period between the child's birth and Floyd's death. This fact alone is not a legal reason to hold that the wage earner did not support the child. The purpose behind requiring a showing of support is that a person in our society who undertakes to provide food, shelter and money for a child provides society with an indicia of reliability that something more than a casual relationship exists between them. When "word and deed" are brought together, the inference that society may draw is that the man has fathered that particular child. The fact finders should not lose sight that the ultimate issue is whether the child was fathered by the wage earner, not how many support payments have been made. The inquiry into support payments is not an end in itself, but rather a tool to aid us in arriving at a well-reasoned decision.

I think the evidence was clear that Mr. Briggs supplied support, albeit at less than regular intervals, to the child. There is nothing inherently implausible about plaintiff's family testifying as to the receipt of support payments. Mr. Briggs admittedly attempted to keep the knowledge of his status as the father of Albert hidden from the public. Surely, he could not do so by writing checks nor by giving the support money to an intermediary for delivery to his family. Mr. Rosensweig saw the bank envelopes pass to Ms. Williams and he saw plaintiff's brother in the store on numerous occasions after the birth of Albert. This evidence points to the fact that Floyd Briggs allocated resources to Ms. Williams after the birth of Albert.

Even though the ALJ found that § 2107(c)(2) requirements were not met, he failed to consider whether the evidence supported a finding under § 2107(c)(3). This was an error since the evidence, particularly the birth certificate naming the father, when viewed as a whole clearly and convincingly supports a finding for the plaintiff.

Unlike subsection (c)(2) which has two technical requirements, each of which must be met for a finding of paternity, subsection (c)(3) focuses solely upon the qualitative nature of the evidence presented. If, after sifting the evidence and weighing it in light of the totality of the circumstances, the court finds that the evidence is clear and convincing, then subsection (c)(3) requirements are met.

In conjunction with the foregoing discussions under subsection (c)(2), there was an additional conclusive piece of evidence which the ALJ did not comment upon in his report. When the child was born, the birth certificate listed as the father, Floyd Bricks, not Briggs. Plaintiff is an unschooled high school drop out. As is readily apparent in reading the transcript of testimony, her grammar and communication skills are minimal. She told the ALJ that she was not sure of the spelling of Floyd's last name. Her explanation is plausible, in light of the surrounding circumstances. If the first name on the birth certificate was any name but Floyd, the court could understand how this evidence could be summarily dismissed, but the exactness of the first name and the phonetic similarity of Bricks and Briggs supports the plaintiff's contentions.

I think the evidence clearly shows that Floyd Briggs was the father of the child. The birth certificate, the conversation with Mr. Rosensweig of Floyd's desire to have plaintiff abort her pregnancy, the testimony of support payments, and the belief of the pawn shop employees that the child was Floyd's, all evidence a man who had fathered a child. The evidence was substantial that Floyd Briggs held the child out to be his own and provided support for him as required by § 2107(c)(2). The evidence also establishes that the child was fathered by the wage earner under § 2107(c)(3). For the foregoing reasons, summary judgment will be granted in favor of the plaintiff. An appropriate order follows.