Clarence R. KELLAM

v.

Otis R. BOWEN, M.D., Secretary of
Health and Human Services.

Civ. A. No. 85–5740.

United States District Court,
E.D. Pennsylvania.

March 10, 1987.

Barry F. Penn, Philadelphia, Pa., for plaintiff.

Catherine Votaw, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final decision of the Secretary of Health and Human Services (the Secretary) denying the plaintiff's application for disability benefits under Title II of the Social Security Act. Presently before the court are the parties' cross-motions for summary judgment.

Plaintiff applied for benefits on November 17, 1982, alleging disability caused by multiple fractures of the right ankle, gout, and arthritis (Tr. 82–91). His application was denied initially and after reconsideration by the Pennsylvania State Agency. Upon plaintiff's request for further review, a hearing was scheduled for October 12, 1983 (Tr. 38). Because plaintiff failed to

appear at the hearing or reply to a Notice to Show Cause for Failure to Appear, the Administrative Law Judge (ALJ) dismissed the hearing request on November 16, 1983 (Tr. 36). Upon plaintiff's request for review of the ALJ's order of dismissal (Tr. 34), the Appeals Council vacated the ALJ's order and remanded the case for consideration of whether plaintiff established good cause for his failure to appear (Tr. 32–33). On remand, the ALJ found that plaintiff had established good cause and therefore the ALJ went on to consider testimony on plaintiff's disability claim (Tr. 47–81). Exactly one year later, on May 2, 1985, the ALJ denied plaintiff's application, concluding that he was capable of performing sedentary work (Tr. 9–17). On August 5, 1985, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Secretary, and therefore reviewable by this court (Tr. 4–5). Plaintiff filed this action seeking judicial review of the ALJ's decision on October 4, 1985.

## FACTS

### A. *The Hearing Testimony*

Plaintiff was born on April 23, 1943, and at the time of the hearing he was 41 years old. He stopped attending highschool at age 19, after he completed the eleventh grade. He has worked as a laborer at a number of jobs.

Plaintiff alleges that he has been unable to work since November of 1980 because of gout (Tr. 60–61, 99). He testified that he suffered gout attacks in his ankles, elbows, toes and fingers, and, more recently, in his back (Tr. 60, 64–67). According to plaintiff's testimony, his illness is extremely debilitating. Plaintiff stated that he was incapable of doing even small household chores, and had to rely on his friend and apartment-mate, Miss Bynum, and a neighbor to do those chores and to shop for him (Tr. 67). Since the onset of the gout, plaintiff testified, he has engaged in no regular activities (Tr. 67). He spends most of his days lying down watching television (Tr. 67). Plaintiff stated that he frequently could not walk without the aid of crutches or Miss Bynum's arm—even from his bedroom to the bathroom—and that he sometimes had to crawl to the bathroom or use a makeshift bedpan. (Tr. 69–73) Plaintiff is apprehensive about falling and worsening his injuries (Tr. 68).

Plaintiff described his pain as "throbbing" and worse than a toothache (Tr. 69–70). According to plaintiff, he is often in intense pain when merely sitting or lying down (Tr. 69–70). He distinguished between "hard attacks," when both of his legs stiffen and he is unable to bend and he must go to the hospital (Tr. 74), and the more routine pain he feels almost every day (Tr. 61). He told the ALJ that he was taking Indosin, Motrin, Tylenol and Mylanta, and that these drugs sometimes stop the pain for a couple of hours (Tr. 63).

Miss Bynum corroborated much of plaintiff's testimony. She testified that she cooked, cleaned and shopped for plaintiff and put hot and cold compresses on his legs when they were bothering him (Tr. 76). She described plaintiff's ankles, in their worst shape, as "grotesque," as if plaintiff were suffering from elephantiasis, and stated that plaintiff was in constant pain and moaned frequently (Tr. 77). Miss Bynum suggested that plaintiff's condition had worsened considerably since September of 1983, though she was aware that he had suffered some attacks before that time.

### B. *The Medical Evidence*

Plaintiff first sought medical treatment for his "painfully swollen ankle," which he had fractured in 1969 and sprained several times thereafter, from Dr. DeGovann on October 11, 1978 (Tr. 168). Dr. DeGovann took x-rays which revealed "a *significant* amount of Osteoarthritis" (Tr. 168) (emphasis in original).

On November 22, 1982, the Disability Department contacted Dr. DeGovann as plaintiff's treating physician. The Department's Report of Contact (Tr. 125–27) reveals that Dr. DeGovann diagnosed plaintiff as having generalized arthritis in both legs which afflicted him most severely in his right ankle (Tr. 126). The doctor re-

ported that "a range of motion," weather changes, and ambulation caused plaintiff pain, but that he had not required surgery or hospitalization and walked, with difficulty, without assistance devices (Tr. 125–26). Dr. DeGovann noted that plaintiff's condition had progressively worsened and he predicted that that trend would continue (Tr. 125–26). Dr. DeGovann, who saw plaintiff periodically after the initial visit, concluded the following in a report dated August 1, 1983:

> the fracture, subsequent healing, and arthritic changes have permanently damaged the ankle to the point where excessive standing and walking has and always will cause severe pain and swelling. Prognosis: As the patient ages, the deformity should become worse. (Tr. 168)

On October 27, 1982, plaintiff was admitted to the Methodist Hospital for aching in his right big toe and ankle that seemed to be spreading to his knees (Tr. 129). Prior to his admission to the hospital, he had felt progressively intensifying pain for three weeks, the last of which he spent in bed (Tr. 129). Upon admission, plaintiff was unable to stand because of pain (Tr. 129). Dr. Piccone, his treating physician during that hospital stay, diagnosed plaintiff as suffering from "acute gouty arthritis and degenerative arthritis of the right ankle," (Tr. 129), for which he prescribed Indocin which relieved plaintiff's pain significantly. Dr. Piccone also noted in his report that plaintiff "uses significant amounts of alcohol on a daily basis" (Tr. 129).

The orthopedic consult, Dr. Zimmerman, saw plaintiff on the third day of his hospital visit, when he could again walk. Dr. Zimmerman noted "severe degenerative arthritis" (Tr. 130) and recommended high-topped support shoes, anti-inflammatory medication and possible future surgery. X-ray studies revealed degenerative changes in the right ankle and calcification of the right leg around the knee, and small bilateral joint effusions in both knees. The x-ray report linked the calcification to plain-

tiff's gout. Plaintiff was discharged on the ninth day after admission with directions to take Indocin regularly.

On January 5, 1983, plaintiff sought treatment at a disability clinic, where he was seen by Dr. Volosin.[1] According to Dr. Volosin, plaintiff arrived on crutches, complaining of pain and immobility in his right ankle. Plaintiff explained to Dr. Volosin that frequent standing caused his foot to turn blue and numb. Dr. Volosin noted plaintiff's history of gouty arthritis, and that "progressive pain and limitation of function in his right ankle" had interfered with his ability to work (Tr. 153). Contrary to the Secretary's recital that "Dr. Volosin documented that plaintiff had full range of motion in all joints," Dr. Volosin stated that plaintiff's ankle had a "markedly limited range of motion." (Tr. 154). Taken in the aggregate, Dr. Volosin's observations appear somewhat inconsistent with his further comment that plaintiff "denies any claudication or pain in his legs with exercise" (Tr. 153). X-rays taken three days later revealed "marked hypertrophic degenerative changes" and "marked soft tissue swelling" (Tr. 159).

On the basis of plaintiff's medical record, as presented above, state agency physicians prepared Residual Functional Capacity Assessments on January 19, 1983 and on April 8, 1983, without examining the plaintiff. Both reports conclude that plaintiff can "stand and/or walk" less than six hours a day, but can sit for about six hours a day. The second report states that plaintiff can "frequently lift and/or carry" ten pounds (Tr. 160).

On April 10, 1984, plaintiff sought treatment at Methodist Hospital for a gouty attack in his "knees, little toes and [left] elbow" (Tr. 170). Plaintiff's condition was rated as "good" when he was discharged after examination. On August 2, 1984, plaintiff again went to the emergency room of Methodist Hospital, complaining of spreading swelling and pain in his hand, wrist and forearm. The treating physician

---

**1.** The Name of the doctor who saw plaintiff on this visit is spelled on the typed report which the doctor had dictated as "Bolosin" but on a hand-

written note written by the doctor himself as "Volosin" (Tr. 155). I therefore assume that "Volosin" is the correct spelling.

diagnosed plaintiff's condition as "progressive inflammation [illegible] probably gout" and prescribed Indocin and a splint (Tr. 177). Upon discharge after examination, the physician rated plaintiff's condition as "stable" (Tr. 177).

The final four-page exhibit in the administrative record includes two pages of "patient instruction sheets." The record does not establish, nor does either party explain, the context in which these instruction sheets were prepared. The last page of the record, entitled "Discharge Instruction Sheet" is also unexplained by the record. Plaintiff elaborates as follows:

> In his last admission to Einstein on January 6, 1985, plaintiff was treated for alcoholism (Tr. 188). He was prescribed librium and advised to seek rehabilitation for his drinking problem with Alcoholics Anonymous (AA).

Plaintiff's Brief at 4 (footnote omitted).[2]

## ANALYSIS

The sole question before the court is whether the Secretary's decision denying the plaintiff's application for benefits is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *see also Smith v. Califano*, 637 F.2d 968, 970 (3d Cir.1981). If they are supported by substantial evidence, the Secretary's findings of fact are binding on this court. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981).

The ALJ found that although plaintiff had a "severe impairment" 20 C.F.R. § 416.920(c), it was not of "sufficient severity or duration" to support a finding of total disability (Tr. 15). He reached this conclusion by determining, first, that plaintiff's impairment was not a listed impairment in Appendix 1, 20 C.F.R. § 416.920(e); second, that plaintiff "had the residual functional capacity to perform the full range of sedentary work"; and finally that

"section 416.969 of Regulations No. 4 and Rules 201.24, Table No. 1 of Appendix 2, subpart P, Regulations No. 4 direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled" (Tr. 17). Plaintiff contests this determination, arguing that the ALJ's finding that plaintiff could perform the full range of sedentary work is not supported by substantial evidence, and that even if it is, a proper consideration of plaintiff's nonexertional limitations would have dictated a finding of disability. In order to dispose properly of the parties' cross motions for summary judgment, this court need only consider plaintiff's first contention.

### A. *Plaintiff's Capacity for Sedentary Work*

In concluding that "claimant has the residual functional capacity to perform the full range of sendentary work" (20 C.F.R. 416.967), the ALJ appears to rely heavily on the Residual Functional Capacity Assessments, which state that plaintiff can lift up to twenty pounds, can stand for less than six hours a day and can sit for approximately six hours a day (Tr. 12–13, 15, 160–67). In addition, the ALJ discounts plaintiff's accounts of pain, concluding that "the claimant's pain although it may well be present, is not of a level of severity to prevent engagement in all work activity" (Tr. 15).

### 1. *Residual Functional Capacity Assessments*

■ Residual Functional Capacity Assessments are three-page forms on which the evaluating physician checks off boxes to inform the ALJ in crude terms what kind of work the applicant is capable of doing. The form provides a space for written comments: In this case those brief written comments simply parrot various phrases of diagnosis from the rest of plaintiff's medical record (Tr. 161, 165). These assessment forms, unaccompanied by

---

**2.** The record reflects that the form was prepared at Mount Sinai Hospital rather than Albert Einstein Hospital.

"thorough written reports" cannot, by themselves, constitute the substantial evidence required to justify an ALJ's denial of benefits. *Green v. Schweiker,* 749 F.2d 1066 (3d Cir.1984). The evidentiary weight of these forms is especially light when they are, as they were in this case, prepared by physicians who never examined the plaintiff. *See Wier v. Heckler,* 734 F.2d 955, 963 (3d Cir.1984); *Spencer v. Heckler,* 765 F.2d 1090, 1094 (11th Cir.1985).

### 2. *Plaintiff's Accounts of Disability and Pain*

■ The ALJ discounts plaintiff's testimony about the severity of his pain because "the treatment which the claimant seeks and the measures taken to alleviate that pain are not in keeping with the measures one takes who suffers from severe intractable pain" (Tr. 15). It is inappropriate for an ALJ to infer that plaintiff is not disabled solely on the basis of the treatment plaintiff has pursued. *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir.1983); *Tyler v. Weinberger,* 409 F.Supp. 776, 789 (E.D.Va.1976). As plaintiff points out in its brief, an indigent's access to medical care is often extremely limited. *See Kent v. Schweiker,* 710 F.2d at 115 (plaintiff's failure to visit physicians more frequently explained, in part, by limited resources). Plaintiff's heavy reliance on emergency room visits for the treatment of an ongoing problem is probably a reflection of that limited access.

Even if financial limitations are disregarded, however, it is not clear what the ALJ had in mind. Plaintiff appears to have taken all logical steps to alleviate his pain: he obtained prescriptions for painkillers and confined himself to the one position in which he is apparently comfortable: a prone position. Plaintiff's testimony that the painkillers were often inadequate, or only helped for a brief period (Tr. 63) does not support the ALJ's conclusion that plaintiff would have sought more medical care if the pain were as bad as he alleged. The fact that plaintiff's pain was so great that the treatment he was prescribed failed to provide significant relief supports rather than discredits his claim of disability.

The ALJ notes in his decision that "pain is a subjective symptom and is not easily measurable." The Third Circuit has made clear that the difficulty of ascertaining and quantifying a plaintiff's allegations of pain does not justify disregarding that subjective testimony, especially when it is supported by some objective medical data. *Green v. Schweiker,* 749 F.2d 1066, 1068 (3d Cir.1984). In this case, plaintiff's allegations are well supported by numerous medical evaluations which record severe degenerative arthritis, gout, and gouty arthritis (*e.g.,* Tr. 129, 130, 168). Indeed, every medical entry that is based on a physical examination or an analysis of x-rays supports a diagnosis consistent with plaintiff's account of localized, but spreading, pains.

■ In disregarding the support the medical evidence lends to plaintiff's subjective accounts of pain, the ALJ not only failed to evaluate the subjective accounts properly, but also failed to justify adequately his ultimate decision to deny benefits. The Third Circuit requires the ALJ to analyze all evidence in the record and to explain his decision to disregard, or give less weight to, evidence that supports a finding of disability. *Cotter v. Harris,* 642 F.2d 700, 704–707 (3d Cir.1981); *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *Gober v. Matthews,* 574 F.2d 772, 776 (3d Cir.1978). In this case, all evidence except the residual functional capacity assessments (Tr. 160–67) and the unexplained Instruction Sheets (Tr. 186, 187) support plaintiff's claim of disability (although none of the treating or consulting physicians reaches a conclusion on the work disability issue). In failing to justify his decision to discount this evidence or to explain how he reconciles this evidence with his decision to deny benefits, the ALJ does not satisfy the Third Circuit requirement set out in *Cotter.*

Furthermore, the ALJ discounts more than plaintiff's testimony about his pain. He also ignores plaintiff's description of his daily activity, or, more accurately, his lack of activity, which Miss Bynum's testimony corroborates. In particular, he seems to

disregard plaintiff's dependence upon his crutches, and what effect that limitation might have on his capacity to do even sedentary work.

 Sedentary work, as defined by the Secretary at 20 C.F.R. § 416.967(a)

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.

Plaintiff testified that even sitting up is painful. As the ALJ noted at the hearing, plaintiff's left thumb has been disfigured by gout (Tr. 65–66). If plaintiff is left-handed, as alleged in plaintiff's motion for summary judgment, his gout would clearly limit the sedentary work he could do that required manual dexterity. And even the doctors who prepared the Residual Functional Capacity Assessments recognized that claimant's ability to perform a sedentary job that involved the operation of foot controls would be limited (Tr. 164). Finally, whether or not plaintiff has the strength do so, plaintiff has little ability to lift and carry objects when he must keep both hands on his crutches whenever he is standing up. The ALJ's conclusion that plaintiff is capable of doing a full range of sedentary work is not supported by substantial evidence.

 This court must determine whether to remand this case to the Secretary for further proceedings or reverse with a direction that benefits be awarded. The decision to award benefits should be made only when the administrative record has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits. *Gilliland v. Heckler*, 786 F.2d 178 (3d Cir.1986); *Podedworney v. Harris*, 745 F.2d 210, 221–22 (3d Cir.1984). Here, the record has not been fully developed. Two documents, submitted after the hearing without any explanation of the basis of their conclusions or their relationship to the rest of the record, suggest that plaintiff

can carry on a range of activity. Indeed, the second document, prepared in February of 1985, suggests that plaintiff can "return to work immediately" (Tr. 187). Further development of the record which clarifies the meaning and value of these evaluations is essential to a fair disposition of this case. Accordingly, the case should be remanded for a disposition by the Secretary not inconsistent with the reasoning of this opinion.

An appropriate order follows.

### ORDER

For the reasons stated in the attached memorandum, it is hereby ORDERED and DIRECTED that:

1) The parties' cross-motions for summary judgment are DENIED.

2) The matter is REMANDED to the Secretary for further proceedings consistent with the analysis set out in the attached memorandum.