**Bobby G. GIBSON, Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Appellee.**

**No. 89–1133.**

United States Court of Appeals, Eighth Circuit.

Submitted June 5, 1989.

Decided Aug. 14, 1989.

Robert E. Young, Paragould, Ark., for appellant.

Karen J. Sharp, Dallas, Tex., and Stuart M. Besser, Baltimore, Md., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and HEANEY, Senior Circuit Judge.

HEANEY, Senior Circuit Judge.

Bobby Gibson seeks disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* and supplemental security benefits under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* He appeals an order of the district court affirming the Secretary's denial of benefits. We reverse and remand.

Gibson is a 42-year-old man who suffers from a congenital deformity of the lumbosacral and right sacroiliac joints, scoliosis of the lumbar spine, alcoholism and mental retardation. The medical evidence indicates that Gibson's spinal problems were first diagnosed by Dr. L.L. Shedd in 1981. At that time, Dr. Shedd noted some straightening of Gibson's lumbar spine and a ten degree loss of flexion in his low back. In 1984, Gibson underwent an examination by Dr. Jacob Williams, who found evidence of scoliosis, some spinal rotation, an asymmetrical pelvic girdle and some separation of the right sacroiliac joint. Dr. Williams diagnosed a congenital deformity of the lumbosacral and right sacroiliac joints, probable peptic disease and slight mental retardation.

In 1978, Gibson was first tested for intellectual functioning by Dr. Stephen Harris.

The results of these tests showed that Gibson has a full scale IQ of 72, placing him in the range of borderline mental retardation. In 1986, Gibson underwent psychological testing by Curtis Atkinson, Ph.D. Atkinson's test results revealed a verbal IQ of 60, a performance IQ of 66 and a full scale IQ of 60, scores which would place Gibson in the mental defective range of intelligence. He felt, however, that Gibson's lack of motivation during testing affected the outcome and he placed Gibson's true IQ at 10 to 15 points higher. Based on these two examinations, the ALJ estimated that Gibson's IQ fell between 70 and 75.

Gibson testified at his hearing that he has a fifth grade education and has great difficulty reading simple text. He has worked at various light factory and construction jobs over the last twenty years but was dismissed from these jobs either because of poor work attendance, an inability to remember instructions or inadequate work performance. He last worked in November 1983 as a materials handler for a construction company but related that he worked under constant supervision at that job.

The ALJ found that while Gibson suffered from a congenital spinal impairment and mild mental retardation, he retained the residual functional capacity to perform light work and could perform his past relevant work as a materials handler. On appeal, Gibson alleges that the ALJ's decision is not supported by substantial evidence. Gibson argues that the ALJ failed to consider the effect of his mental limitations on his ability to work and failed to consider the combined effects of his physical and mental limitations. We agree.

Under the regulations, a claimant with an IQ of 59 or less, or an IQ of 60 to 69, inclusive, and an additional physical impairment is deemed disabled without consideration of his ability to perform past relevant work. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05(B) and (C). In this case, Gibson has tested with an IQ slightly higher than 69 and with an IQ lower than 69. The ALJ credited Dr. Atkinson's belief that Gibson's 1986 test results did not accurately determine his IQ and relied on the 1978 test results. Based on the earlier IQ tests, the combination of Gibson's back impairment and his low mental functioning are not quite severe enough to automatically qualify him for disability under section 12.05(B) or (C).

Yet, Gibson's low mental functioning, in combination with his back problems, may operate to preclude him from performing his past relevant work. Gibson reported that he has been turned down for jobs several times because of his back problem. He also stated that when working at his last job, he was under constant supervision because his employer did not feel he could remember the instructions if allowed to work alone. Thus, his mental retardation, whether mild, borderline or severe, has affected his ability to work in the past.

The Secretary does not dispute that Gibson has a congenital abnormality of the lumbar spine. Nor does it dispute that Gibson has an IQ between 70 and 75. The ALJ held that neither of these impairments, individually, was severe enough to prevent Gibson from performing unskilled entry level light work. The ALJ reasoned that neither impairment prevented Gibson from working in the past as a material handler for an automobile shock manufacturer, that Gibson's back impairment limited him to light work activities and that his borderline mental functioning limited him to jobs which required no technical skills, written reports or supervisory responsibilities. Thus, he held that Gibson's present residual functional capacity was consistent with the requirements of his past relevant work.

This analysis, however, omits certain significant evidence. In 1978, Dr. Harris reported that Gibson's borderline intelligence and passive-aggressive personality affected Gibson's ability to relate to others. He found severe impairments in Gibson's ability to perform work requiring frequent contact with others. In 1986, Dr. Atkinson found serious limitations in Gibson's ability to follow work rules, to relate to co-workers, to deal with the public, to deal with work stresses, to function independently, to

maintain work attendance and to remember and carry out simple job instructions. None of these impairments were considered by the ALJ. While we understand that Dr. Atkinson questioned Gibson's motivation during the 1986 psychological testing, his evaluation of Gibson's ability to make occupational and social adjustments is consistent with Gibson's past work record. Nothing in the record contradicts Dr. Atkinson's findings. In fact, Gibson's sister, Judy, testified at the hearing and recounted Gibson's long history of low stress tolerance, high dependency on family, and poor work attendance. An ALJ must show that he evaluated all of the evidence before rendering a decision, *Herbert v. Heckler*, 783 F.2d 128, 130 (8th Cir.1986), and may not discredit a claim by ignoring medical evidence. *Chitwood v. Bowen*, 788 F.2d 1376, 1377 (8th Cir.1986) (per curiam). Thus, the evidence contained in the reports of Dr. Harris and Dr. Atkinson must be considered to determine Gibson's residual functional capacity.

Furthermore, if a claimant suffers from a non-severe impairment, such as low intellectual functioning, and from one or more severe impairments, the combined effect of all the impairments must be considered in assessing a claimant's residual functional capacity. *Webber v. Secretary, Health & Human Services*, 784 F.2d 293, 298 (8th Cir.1986).

The ALJ has an obligation to consider the combined effect of a claimant's impairments. 20 C.F.R. § 404.1522. As this Court has stated:

> Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being.

*Reinhart v. Secretary, Health & Human Services*, 733 F.2d 571, 573 (8th Cir.1984). Only after a proper evaluation of Gibson's mental limitations is made can the ALJ determine whether the combined effect of his back impairment and his low intellectu-

al functioning precludes Gibson from performing his past work.

We believe the ALJ failed to consider all of the evidence relating to Gibson's mental impairment and failed to evaluate how the limitations set out by Dr. Harris and Dr. Atkinson, in addition to Gibson's physical impairments, affect Gibson's residual functional capacity. Thus, we remand to the district court with instructions to remand the case to the Secretary. On remand, the Secretary must evaluate Gibson's residual functional capacity in light of all of his physical and mental limitations. If the Secretary doubts the accuracy or the validity of the psychological testing in the record, it may either seek clarification from Dr. Atkinson or order Gibson to undergo another psychological evaluation.