**William J. STOKES, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

**Civ. A. No. 90–63.**

United States District Court, W.D. Pennsylvania.

July 3, 1990.

Karl E. Osterhout, Robert N. Peirce, Jr. & Associates, Pittsburgh, Pa., for plaintiff.

Amy Reynolds Hay, Asst. U.S. Atty., for defendant.

## OPINION

COHILL, Chief Judge.

Plaintiff William J. Stokes filed this action pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3), seeking review of the final decision of defendant Secretary of Health and Human Services denying him Supplemental Security Income. Presently before the Court are plaintiff's and defendant's cross-motions for summary judgment. For the reasons set forth below, we will grant plaintiff's motion and deny defendant's motion.

## PROCEDURAL HISTORY

Plaintiff William J. Stokes filed his first application for Social Security Income on March 10, 1987, alleging disability from advanced emphysema, hernia, mental problems and alcoholism. This claim was denied at all agency levels and apparently plaintiff did not appeal to the district court.

Mr. Stokes filed his current application for Social Security Income on June 9, 1988, alleging disability from alcoholism and "nerves." Tr. 84. The claim was denied initially on August 4, 1988, Tr. 99, and upon reconsideration on September 7, 1988. Tr. 119. Pursuant to Mr. Stokes' request for a hearing, an Administrative Law Judge ("ALJ") held a hearing on May 11, 1989. Tr. 16–35. On August 9, 1989, the ALJ issued his decision, finding Mr. Stokes ineligible for Social Security Income. Tr. 6–10. On December 5, 1989, the Appeals Council denied claimant's request for review. Tr. 3. Mr. Stokes filed his complaint in this Court on January 11, 1990.

## FACTS

Plaintiff William J. Stokes, born July 20, 1944, failed fourth and seventh grades and left school after ninth grade, Tr. 191, but obtained a Graduate Equivalence Diploma in November 1968. Tr. 22. He is single and has lived alone since 1967, either in one room or on the streets. Tr. 20–21, 34. He eats most of his meals at the Salvation Army or at various missions. Tr. 20. He currently weighs 130 pounds, down from a normal 145 pounds. *Id.* He served in the Air Force as a food service worker for nearly 3½ years before he was honorably discharged for an "attitude problem." Tr. 21.

Mr. Stokes worked as a laborer for approximately 10 years. Plaintiff thought he last worked in 1980. Tr. 22. He stated he stopped working then because he "couldn't work anymore;" he "couldn't get up in the morning to make it." *Id.* However, he again worked for two months in summer 1988 at a cleaning job until he became fatigued and "it got too hard for [him]." Tr. 23.

Plaintiff stated that he experiences fatigue that makes it difficult for him to bend or stoop or pick anything up. He is not sure whether the fatigue is mental or physical, but he thinks "it must be mental." Tr. 23. He states that he gets generalized muscle aches and pains. *Id.* He believes he could lift 100 pounds, "but it would be very hard." Tr. 24.

The ALJ asked Mr. Stokes about his alcoholism. Plaintiff states that he has been drinking beer every day for the past six years. Tr. 24. He drinks until he runs out of money. *Id.* If he had $100 in his pocket, he would spend it all, but routinely he can "get through a half a case easy." Tr. 25. In four hours he can drink half of a case of "sixteeners" or "whatever is available." *Id.* When the ALJ asked him if he ever gets drunk, Mr. Stokes stated that he does not get "staggering drunk," but he feels sluggish, depressed and a little dizzy. Tr. 24–25.

Mr. Stokes uses his welfare money to buy beer, but he makes sure the monthly rent of $100 is paid first. Tr. 30, 86. He drinks alone in his room, *id.*, or at a bar with other people. Tr. 31. Besides drinking with these people he does not do anything else. *Id.*

Although at the time of the hearing, Mr. Stokes was not being treated, he stated

that he had applied for, and was currently on the list for, treatment at the Mental Health Mental Retardation facility on the Pittsburgh "south side." Tr. 25–26. Upon further questioning, Mr. Stokes admitted that, although he had the application papers, he had not yet filled them out or submitted them. Tr. 32. He stated he needed help to fill them out and did not have anyone to help him. Tr. 33.

Mr. Stokes last was treated for alcoholism beginning in the summer of 1988, when he signed in to the Butler, Pennsylvania Veterans Administration ("VA") Hospital. He remained in a hospital ward for 40 days before being sent to Donofrio, an alcohol rehabilitation center in Youngstown, Ohio. Tr. 27. After five months at Donofrio, Mr. Stokes returned voluntarily to the VA domiciliary unit for three months ending in May 1989. Tr. 26.

Upon leaving the domiciliary, Mr. Stokes received counselling at the Salvation Army in Pittsburgh. Tr. 28. He discontinued this therapy in the winter because he "can't take the cold too well," and he did not have money for buses. *Id.* He stated that when the weather got warmer, he returned to the counsellor, but "she had dropped my case." Tr. 32. Since January 1989 he has not received any treatment for alcoholism. Tr. 29.

In denying Mr. Stokes' claim on August 11, 1988, the ALJ relied on Exhibits 19, 21 and 23.

Exhibit 19 is an Inpatient Discharge Summary from the Highland Drive VA hospital in Pittsburgh, dated March 2, 1987. Mr. Stokes' discharge diagnoses were alcohol dependence in remission, dysthymic disorder, passive-agressive personality disorder, and hernia.

Mary Sullivan, M.A., a clinical psychology intern signing the summary for William Ubinger, M.D., stated that plaintiff had been living as a street person since September 1986. Tr. 179. She reported that Mr. Stokes is strictly a beer drinker, who, when he can borrow money, will drink beer in a bar all day. He reported "symptoms of alcohol dependence such as loss of control, blackouts, and a change in tolerance." *Id.*

Plaintiff had attempted rehabitation twice in the 1970's, participating in less than half the program. In 1974 he attempted to overdose on Phenobarbital.

Ms. Sullivan stated that plaintiff cannot remain employed because he fears losing control over his anger, although he had not acted on angry impulses. *Id.* He does not socialize except for bar companions. He contacts only one of four sisters. Tr. 180. He lacks ability to express anger, either without losing control or withdrawing. He has taken anti-psychotic medication for persecutory delusions associated with alcohol consumption. Tr. 179.

Mr. Stokes successfully completed a 28–day program, participating in individual counselling, group psychotherapy, assertiveness training, relapse prevention, alcohol education and incentive therapy. Tr. 180. Ms. Sullivan stated that plaintiff identified his "social isolation as a major problem, but continued to avoid dealing with [it] by forgetting to attend" counselling sessions. *Id.*

Upon discharge, Mr. Stokes' prognosis was "guarded" because he had not decided whether to enter Harbor Light Halfway House and had no place to stay after release. *Id.*

Exhibit 21 is a report from Leon Kalson, Ph.D., who examined Mr. Stokes for the Social Security Administration on May 29, 1987. Tr. 190.

Dr. Kalson stated that plaintiff arrived alone, unkempt, unshaven, bleary-eyed and shabbily attired with neatly combed hair. Despite his appearance he was articulate, cooperative and rather personable and intelligent. *Id.*

Mr. Stokes smokes 2 packs of cigarettes a day and has abused alcohol for many years, despite treatment at Gateway Rehabilitation Center and Highland Drive VA, as well as Alcoholics Anonymous ("AA") attendance. In 1974 he was hospitalized at Irene Stacy Mental Health Clinic in Butler, Pennsylvania for chronic anxiety. He had attempted suicide by overdose.

Mr. Stokes described sexual problems including closet-transvestitism. Although he

is heterosexual, he is afraid of women. Tr. 191. Plaintiff has intellectual and mechanical-manual capabilities that have not been fulfilled in a stable job, for reasons possibly related to his "nomadic existence." *Id.*

Plaintiff's general knowledge was satisfactory, and his responses were relevant. Affect was normal and eye contact was good. He was oriented to time, place and person and his memory was intact. Dr. Kalson stated that remote and recent memory were intact, however, retention and recall were impaired. The doctor opined that plaintiff understood his condition and had insight; however, he was not receiving current treatment for alcoholism. Tr. 192.

Dr. Kalson summarized that plaintiff could carry out routine tasks, meet time schedules and generally meet the demands of competitive employment "although his alcohol abuse can be a deterrent." Tr. 192. The doctor stated that plaintiff appeared to be a good vocational rehabilitation candidate. *Id.*

Exhibit 23 includes reports from the Butler VA hospital. Tr. 113. L. Jordan, M.D. reported that plaintiff had been admitted on March 7, 1988 and discharged on June 2, 1988. He was given the following diagnoses: Chronic alcoholism, possible gastric ulcer, probable schizoid personality disorder. Tr. 206.

Dr. Jordan stated that plaintiff was admitted to the domiciliary for treatment of alcoholism and sobriety maintenance. He was also followed in the Mental Hygiene Clinic for assessment of a schizoid personality disorder and in the Medical Clinic for epigastric discomfort.

An upper gastrointestinal x-ray series showed a possible gastric ulcer; therefore Mr. Stokes was scheduled for further testing. He was given Tagamet, 300 mg. Liver functions showed "an increase in his gamma GTP." Although blood tests had been ordered, apparently they had been overlooked and remained uncompleted at the time of the report. *Id.*

Plaintiff precipitously left the Butler VA before any further testing could be completed. Mr. Stokes told his counsellor that he would go to Allegheny General Hospital

for follow-up of his gastrointestinal problems. The Mental Hygiene counselors believed that "he probably planned to drink." *Id.* Plaintiff was given an "irregular" discharge from the hospital with no follow-up orders or prescriptions. *Id.*

The hospital notes reveal that plaintiff had a "paranoia" problem that provided an excuse to prevent him from engaging in AA meetings. Tr. 210. He had some difficulty tracking discussions in group therapy, but he participated appropriately when asked. *Id.*

The staff discussed plaintiff at a team meeting. The staff noted a flat affect, poor insight and lack of self-motivation or responsibility. The progress note stated that the staff had confronted plaintiff about his poor group activity, lack of an AA home group or sponsor and poor money management. Mr. Stokes had agreed to correct these deficiencies. Tr. 215.

On April 7, 1988 the progress notes reported that plaintiff had stated, "I'm feeling too pressured and I think I might "bug." Tr. 216. The note stated that plaintiff did not feel he could meet the demands of the program to get a sponsor, find a home AA group and attend meetings regularly. Mr. Stokes did not "feel comfortable with people or believe in AA." *Id.* The counsellor stated that plaintiff appeared to be "setting himself up for relapse," indicated bitterness and frustration, and lacked motivation, self direction and responsibility. *Id.* He did not indicate any desire to work on his problems and his thought processes appeared disturbed. *Id.*

An undated report, most likely in April 1988, outlined a family history including his parents' divorce when plaintiff was 13. Plaintiff was raised thereafter by his alcoholic father. Tr. 217. The progress note also stated that Mr. Stokes remained in denial, was sober only by virtue of the program, was not bonded to AA and was thinking of returning to the streets. He was avoiding discussions and larger groups. *Id.*

On April 22, 1988 he participated actively in a discussion of a Supreme Court deci-

sion, but experienced cognitive gaps. *Id.* On April 25, 1988 the notes revealed that plaintiff had multiple somatic complaints but no psychosis or suicidal ideation. Tr. 218. The staff was following him closely because he was "not invested heavily in AA." *Id.*

R. Baker, M.D., stated on May 2, 1988 that plaintiff had mood swings, a history of shopping sprees, a slight stammer and rambling speech, poor concentration, and a history of "mind racing." Tr. 220. Dr. Baker stated that plaintiff's intelligence was normal and, although he had had no alcohol for nine months, his insight and judgment were "variable." Dr. Baker diagnosed atypical bipolar depression, with a note to rule out passive depression. Tr. 220. Mr. Stokes was treated with Thorazine, 10 mg., four times a day. *Id.*

On May 3, 1988, a counsellor discussed mood swings and an overdose attempt of "years ago" with plaintiff. Mr. Stokes stated that he took the overdose on impulse when he broke up with a girlfriend. The counsellor noted that plaintiff was anxious and did not recommend that he be permitted self-medication privileges. Tr. 219.

On May 11, 1988, personnel spoke to plaintiff about inappropriate behavior and noted that behavior modification would be utilized if required. Tr. 222. He was cautioned to be more appropriate, timely and responsible.

On May 25, 1988, a counsellor noted that plaintiff claimed to be searching for an AA sponsor and home group but that he appeared uneasy about any discussion of or reference to AA. Tr. 223. He continued to avoid and deny the issue and remained passive, unable to deal with "several incidences of confrontation." *Id.*

On May 26, 1988, Mr. Stokes stated that he wanted to leave the hospital. Dr. Baker increased his dose of Thorazine and gave an order for a nurse to furnish more as required. Plaintiff was seen by William P. Smith, M.D., on an emergency consult. The doctor stated that plaintiff was anxious and irritable, feeling that his schedule was too demanding. Tr. 224. The doctor stated, "My sense is that patient is feeling

real uncomfortable and plans to drink." Plaintiff agreed that he was thinking of drinking. *Id.*

On June 2, 1988, despite the staffs' attempts to dissuade him, plaintiff left the Butler VA domiciliary unit. Tr. 226–27.

In addition to those exhibits on which the ALJ relied, we find on record two additional ones, Exhibits 20 and 22. Exhibit 20, dated May 5, 1987, is the report of Leo H. Creep, M.D., who saw plaintiff on a consultative basis. Tr. 181.

Dr. Creep stated that Mr. Stokes' chief complaint was persistent nervousness. The doctor stated that plaintiff does not anger easily and does not have altercations with others.

The doctor noted that plaintiff has been exposed to repeated alcohol counselling with poor compliance and unfavorable results. Tr. 181–82. Dr. Kalson stated that plaintiff was drinking 4 to 5 bottles of beer a day, less than formerly. *Id.* The doctor reported that if plaintiff does not drink any beer, he sleeps undisturbed from 10 P.M. until noon the next day. Tr. 182. The doctor noted that plaintiff did not seem especially alert, feels depressed, experiences ideas of persecution and feels socially isolated. Tr. 182–84. He has a history of mild suicidal tendencies with one suicide attempt. Dr. Kalson also reported that plaintiff "passes his time doing actually practically nothing" and has no friends. Tr. 182.

Exhibit 22 includes medical records from Allegheny General Hospital from July 9 to July 28, 1987. Tr. 198–205. Plaintiff sought treatment for a hernia.

The progress notes revealed that Mr. Stokes was drinking large amounts of water and was fatigued. He stated that he was living on the streets and would not return to the VA for follow-up on his treatment. Tr. 198. Plaintiff gave a history of mental problems, including treatment at Butler County Memorial Hospital, the Butler VA Hospital, the Irene Stacy Mental Health Clinic and the Oakland VA. The progress notes stated: "Can't think straight—always have a disturbance in

head." Tr. 201. Plaintiff was assessed an alcoholic with mental illness, paranoid schizophrenia, and psychosocial problems. Tr. 202, 205.

We also find on record an unnumbered exhibit which includes hospital records from the Butler VA Hospital for August 24, 1987 to September 30, 1987. Tr. 228–242.

The record stated that plaintiff began drinking in 1963 while he was in the Air Force. Tr. 228. The progress notes reveal repeated suggestions that plaintiff should participate in the alcohol rehabilitation unit ("ARU").

A social worker stated that plaintiff might be a candidate for relapse and half-way house placement. Tr. 231. The ARU coordinator noted that plaintiff was scheduled to go to a halfway house but he "seems to have abdicated all responsibility for himself ... and does not see treatment as a step to more independent living." Tr. 235. Plaintiff spent most of his time in bed and would not socialize. Tr. 237.

Mr. Stokes became very anxious and found it difficult to use relaxation techniques. For example, although he initially attempted to avoid a bowling outing, stating that he was sick, he felt more comfortable after he was encouraged to go. Tr. 236.

Throughout the progress notes, various personnel reported that plaintiff was irresponsible and noncompliant, that he refused to participate in AA meetings, and that he was uncooperative and unmotivated toward alcohol rehabilitation. Tr. 237–39. He was referred to Donofrio Halfway House. In summary, a social worker stated that Mr. Stokes exhibited moderate impulsivity, severe depression and low self-esteem and extreme lack of social skills. Tr. 240.

In his decision, the ALJ stated that plaintiff testified to "various vague physical complaints, such as fatigue." Tr. 8. The ALJ determined that although plaintiff drinks up to half of a case of beer daily, he never gets "really drunk." Id. The ALJ noted the history of alcohol abuse, but stated that plaintiff had successfully completed a 28–day rehabilitation program in January

1987 and that while he was undergoing treatment in 1988 at the domiciliary, he did not drink for three months. Id.

The ALJ stated that no medical evidence supported plaintiff's physical complaints. The ALJ determined that plaintiff's alcoholism is not related to or affected by any significant psychiatric or psychological impairment.

The ALJ stated that "while the evidence shows that the claimant is an alcoholic it reveals that he has not lost his ability to control the use of alcohol." The ALJ cited as an example that plaintiff's daily drinking does not result in him becoming "really drunk" or "staggering drunk." Moreover, plaintiff "displayed the capacity to seek a remedy for his addiction by his various confinements for treatment." Tr. 8. In addition, the ALJ observed that plaintiff had sought admission to a mental health facility. The ALJ stated that he was "of the opinion that this shows that the claimant has the ability to control the use of alcohol and to seek the means to remedy his addiction." Id.

The ALJ asserted that the record evidence establishes that although plaintiff's alcoholism imposes restrictions on his ability to perform basic work related functions, the impairment does not meet severity requirements. Tr. 7. The ALJ concluded that plaintiff "retains the mental functional capacity to perform his past unskilled work as a laborer, which requires no detailed instructions." Tr. 9.

## DISCUSSION

 Summary judgment may be granted only on a showing that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The standard of review is whether substantial evidence exists in the record to support the Secretary's decision. *Allen v. Bowen*, 881 F.2d 37, 39 (3d Cir.1989). The Secretary's findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.1979). Substantial

evidence is not "a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). A single piece of evidence does not satisfy substantiality if the Secretary ignores, or fails to resolve, a conflict created by conflicting evidence. *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir.1986).

■■■■ Plaintiff carries the initial burden of proof to demonstrate by medical evidence that he is disabled. The burden then shifts to the Secretary to analyze and sufficiently explain the weight he has given to probative exhibits in arriving at his conclusion. *Dobrowolsky*, 606 F.2d at 407. The Secretary must state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *York v. Bowen*, 702 F.Supp. 903, 905 (N.D.Ga.1987)

To establish eligibility for Supplemental Security Income, plaintiff must demonstrate that he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

■■■■ It is well settled in this circuit that "chronic alcoholism ..., standing alone, can, if serious enough, amount to a disability." *McShea v. Schweiker*, 700 F.2d 117, 118 (3d Cir.1983). Moreover, "[t]he proposition that chronic acute alcoholism is itself a disease, 'a medically determinable physical or mental impairment,' is hardly debatable today." *Id.* Alcoholism, either alone or combined with other conditions, can constitute compensable disability if a claimant is unable to engage in substantial gainful employment. *Id.* at 119. The Secretary must inquire whether the claimant is addicted to alcohol and is therefore unable to control its use. *Id.*

■■■■ In 1975, the Social Security Administration amended its regulations pertaining to alcohol. *Purter v. Heckler*, 771 F.2d 682, 696 (3d Cir.1985). No longer need a claimant show end-organ damage or any physical manifestation of mental illness apart from alcoholism. The amendment reflects a change from society's traditional view of alcoholism as a self-inflicted condition towards a recognition that alcoholism is a disease often not subject to its victims' control. *Id.* at 697.

In *Sullivan v. Zebley*, — U.S. —, 110 S.Ct. 885, 888–89, 107 L.Ed.2d 967 (1990), the Supreme Court explained the operation of the Secretary's five-step evaluation process for determining whether a person is disabled:

The first two steps involve threshold determinations that the claimant is not presently working, and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry.

*See* 20 C.F.R. § 404.1520.

To determine whether a claimant is disabled from alcoholism, the Secretary uses at step three of the evaluation a section entitled "Mental Disorder" at 20 C.F.R. Part 404, Subpart P, Appendix 1 (Part A), § 12.09.

■■■ For plaintiff to be found disabled from alcoholism, he first must meet the capsule definition of that impairment under § 12.09, Substance Addiction Disorders: "Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." If a claimant meets this definition, he is addicted to alcohol. *In re: Petition of Louis W. Sullivan, M.D.*, 904 F.2d 826, 841 (3d Cir.1990) (citing *Zebley*, 110 S.Ct. at 891).

■■■ Substantial evidence exists on record that Mr. Stokes is not able to control his use of alcohol. Plaintiff began drinking

in 1963, Tr. 228, and for at least six years, when not hospitalized, he has been drinking half a case of beer a day. Tr. 24. Plaintiff repeatedly has attempted to rehabilitate himself, for example, in 1987 at the Highland Drive VA for 28 days, Tr. 179, and beginning in summer 1988 in conjunction with the Butler VA for 40 days and the Donofrio Halfway House for 5 months, Tr. 26–27. He also was treated at Gateway Rehabilitation Center and at Irene Stacy Mental Health Clinic. Tr. 179. He obtained outpatient counselling through the Salvation Army. Tr. 28. Throughout these treatments, progress notes revealed that Mr. Stokes remained in denial and was sober only by virtue of the program. Tr. 217.

The Secretary's own consultant, Dr. Creep, observed that Mr. Stokes "has been exposed to repeated alcohol counselling with poor compliance and unfavorable results." Tr. 181–82. Despite numerous efforts at treatment, Mr. Stokes stated at the hearing that he will drink until he runs out of money, even if he has $100 in his pocket. Tr. 25.

Analyzing this evidence, the ALJ concluded that these various confinements for treatment indicated that plaintiff had the capacity to seek a remedy for his addiction. Tr. 8. Furthermore, the ALJ opined that one who does not become staggeringly drunk is not out of control.

We are cognizant that it is not alcoholism alone, but rather uncontrolled drinking, that may constitute a disability. *Clem v. Sullivan*, 894 F.2d 328, 331 (9th Cir.1990). However, the record does not furnish substantial evidence that Mr. Stokes can control his alcohol consumption. Furthermore, the ALJ made no attempt to resolve any conflicts in the evidence. An ALJ must show that he evaluated all of the evidence before rendering a decision and may not discredit a claim by ignoring medical evidence. *Gibson v. Secretary of Health and Human Services*, 882 F.2d 329, 331 (8th Cir.1989) (citations omitted). We therefore find that plaintiff has met his burden to establish that his condition falls within the capsule definition for alcoholism.

Next the Court must determine whether Mr. Stokes' alcoholism is severe enough to warrant a finding of disability. "An impairment·simply names a disorder, while a listing determines whether an impairment exists and is severe enough to preclude any gainful activity." *In re: Petition of Louis Sullivan*, 904 F.2d at 840. For a claimant to show that his impairment matches a listing, he must meet all, not merely some, of the medical criteria applicable to that particular listing. *Id.* at 839.

Section 12.09 contains nine listings which are cross-referenced to four mental disorder sections and five physical disorder sections. Alcoholism will be considered objectively severe enough to render a claimant unable to perform any gainful activity without reference to his residual functional capacity only when the claimant meets all the requirements of any one of the cross-referenced listings. *Id.* at 844. Thus, not every person who meets the clinical definition of alcoholism, and is therefore unable to control his drinking, will automatically be considered unable to perform any gainful activity. *Id.* at 845. The law requires in addition an inquiry into the severity of the alcoholism. *Id.*

Section 12.09 states that: "The required level of severity for these disorders [Substance Addiction Disorders] is met when the requirements in any of the following (A through I) are satisfied." 20 C.F.R., Part 404, Subpart P, Appendix 1, (Part A), § 12.09. The evidence on record shows that two of the listed categories are arguably relevant to Mr. Stokes' case. One of these, "B. Depressive syndrome," is cross-referenced to and must be evaluated under § 12.04. The other, "D. Personality disorders," is cross-referenced to and must be evaluated under § 12.08.

Section 12.04 defines Affective Disorders. Mr. Stokes need not meet the capsule definition under this section to show that he may be disabled. *In re: Petition of Louis Sullivan*, 904 F.2d at 844–45. Plaintiff need satisfy only the requirements under § 12.04 A, dealing with depression, or § 12.04 B, pertaining to manic

syndrome. Only § 12.04 A is relevant here.

█ Section 12.04 A requires plaintiff to document the persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

 a. Anhedonia or pervasive loss of interest in almost all activities; or

 b. Appetite disturbance with change in weight; or

 c. Sleep disturbance; or

 d. Psychomotor agitation or retardation; or

 e. Decreased energy; or

 f. Feelings of guilt or worthlessness; or

 g. Difficulty concentrating or thinking; or

 h. Thoughts of suicide; or

 i. Hallucinations, delusions or paranoid thinking.

We find on record substantial evidence of depressive syndrome manifested by many of these factors. Mr. Stokes has demonstrated a pervasive loss of interest in almost all activities. He does little else except to socialize with bar companions. Tr. 31, 180. Dr. Creep stated that "he passes his time doing actually practically nothing." Tr. 182. Although the record reveals that he is thin, rather than emaciated, his weight has decreased from a normal 145 to 130 pounds.

Dr. Creep reported that if plaintiff "does not drink any beer," he sleeps "undisturbed" for 14 hours and he still does not seem especially alert. Tr. 182, 184. Furthermore, despite excessive sleeping, plaintiff reports overwhelming fatigue. He stated that he could not get up in the morning to make it to work and that he experiences fatigue that prevents him from bending or stooping. Tr. 22.

Dr. Kalson opined that plaintiff's general knowledge was satisfactory, his responses were relevant, his memory was intact and he was oriented. Tr. 192. However, progress notes from the Butler VA Hospital reveal that plaintiff's "thought processes appeared disturbed." Tr. 216. Dr.

Baker reported poor concentration and a history of "mind racing." Tr. 220. Records from Allegheny General Hospital reported that plaintiff had difficulty tracking discussions, Tr. 210, could not think straight and always had a "disturbance in his head." Tr. 201. And the record is replete with references to plaintiff's anxiety and nervousness. Although plaintiff has apparently not attempted suicide since 1974, the evidence shows that various counsellors have addressed this problem with him. Dr. Creep stated that he has a history of mild suicidal tendencies. Tr. 182. In May 1988, after discussing mood swings and the attempted Phenobarbital overdose, a counselor recommended that Mr. Stokes not be permitted to manage his own medications. Tr. 219. Mr. Stokes has taken medication for control of persecutory delusions. Tr. 179. In addition, Allegheny General Hospital records reveal that plaintiff has a "paranoia" problem, Tr. 210, and diagnosed him as a paranoid schizophrenic. Tr. 202.

The ALJ failed to address any of this evidence in the context of possible depressive syndrome. The regulations require that plaintiff demonstrate substantial evidence of only one factor, but in fact, he has carried his burden on no less than six. We therefore find that Mr. Stokes is disabled from a § 12.04 impairment without reference to his residual functional capacity.

█ The other arguably applicable section, § 12.08, defines personality disorders. To meet the severity levels under this section, plaintiff must satisfy the requirements in both subsections A and B.

Subsection A refers to "Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

1. Seclusiveness or autistic thinking; or

2. Pathologically inappropriate suspiciousness or hostility; or

3. Oddities of thought, perception, speech and behavior; or

4. Persistent disturbances of mood or affect; or

5. Pathological dependence, passivity, or aggressivity; or

6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B. Resulting in three of the following:

1. Marked restrictions of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work setting or elsewhere); or

4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)."

Mr. Stokes shows a persistent pattern of several of the maladaptive behaviors enumerated in the regulations. For example, besides pathological suspiciousness or hostility evidenced by paranoia, the ALJ ignored substantial evidence that plaintiff experiences oddities of thought, perception, speech and behavior. Mr. Stokes is a closet transvestite and suffers from fetishism. Tr. 191. Plaintiff experiences mood swings, sometimes resulting in shopping sprees. Tr. 220. His speech may be rambling or he may stammer. *Id.* He has demonstrated impulsive behavior by attempting suicide, Tr. 219, and by precipitously checking himself out of rehabilitation programs. Tr. 28, 226–27.

Mr. Stokes' hospital records contain numerous mention of mood swings or flat affect. He lacks ability to express anger. Tr. 179. Allegheny General Hospital records reveal flat affect and lack of self-motivation. Tr. 215. Mr. Stokes felt that "he might bug;" he was frustrated and bitter, and he lacked direction and desire to work on his problems. Tr. 216. A social worker observed severe depression and low self-esteem. Tr. 240.

Upon discharge from the Highland Drive VA, plaintiff was diagnosed as having a passive-aggressive personality disorder. Tr. 179. Mr. Stokes avoided dealing with social problems by "forgetting" to attend meetings. Tr. 180. He remained passive in the face of "several incidences of confrontation." Tr. 223. Plaintiff repeatedly abdicated all responsibility for himself, refusing to invest himself in the AA programs. Tr. 235. Plaintiff became anxious about living independently, avoiding social contact unless the staff encouraged him. Tr. 236.

These examples of maladaptive behavior provide substantial evidence that Mr. Stokes' conditions satisfy the severity levels under subsection A of § 12.08. In addition, these behaviors must result in three of the factors listed in subsection B. Plaintiff has presented substantial evidence to meet his burden here as well.

Even the Secretary's own consulting physicians have observed the marked restrictions in plaintiff's daily living activities. Dr. Kalson reported that besides drinking alone in his room or in a bar, plaintiff leads a "nomadic existence." Tr. 191. Dr. Creep stated that plaintiff passed his time doing practically nothing. Tr. 182. And a social worker at the Butler VA Hospital stated that plaintiff spent most of his time in bed, taking no responsibility for himself. Tr. 235, 237.

Mr. Stokes shows marked difficulties maintaining social functioning. He reported that other people loaned him money for cigarettes or beer. Tr. 31. However, he stated he did not have anyone to help him fill out application papers for treatment. Tr. 33. Although he has four sisters, he contacts only one. Tr. 180. He is afraid of women. Tr. 191. He feels socially isolated, Tr. 182–84, and has no friends. Tr. 182. He avoids AA meetings in part because he does not feel comfortable with people. Tr. 216.

The record contains numerous examples of plaintiff's failure to persist or concentrate on anything, particularly with respect to his repeated rehabilitation efforts. In the 1970s he quit several treatment programs before he completed half of them. Tr. 179. Clinical records show that in response to irresponsible behavior, hospital staff cautioned Mr. Stokes to be more ap-

propriate, timely and responsible.. Tr. 222. Plaintiff showed a lack of motivation for working on his problems. Tr. 216. And when plaintiff last worked, he quit because fatigue made it "too hard" for him. Tr. 23.

■ The ALJ may not ignore plaintiff's description of his daily activity, or more accurately, his lack of activity, especially where other evidence corroborates plaintiff's assertions. *Kellam v. Bowen*, 663 F.Supp. 238, 242 (E.D.Pa.1987). Here we find on record substantial evidence that plaintiff experiences marked limitations in his daily living activities.

■ To determine whether a basis in law or fact exists for concluding that a claimant is not disabled, the Court may review whether the Secretary has properly evaluated the evidence in the record as a whole. *Anderson v. Sullivan*, 725 F.Supp. 704, 705 (W.D.N.Y.1989). The United States Court of Appeals for the Third Circuit requires the ALJ to analyze all evidence in the record and to explain his decision to disregard, or give less weight to, evidence that supports a finding of disability. *Kellam v. Bowen*, 663 F.Supp. at 242, (citing *Cotter v. Harris*, 642 F.2d 700, 704–07 (3d Cir.1981)).

As we have pointed out in our analysis, Mr. Stokes has recorded substantial evidence of his disability from alcoholism. In contrast, the ALJ has failed to evaluate or explain why he rejected even the evidence provided by his own consultants. It is well established that if the record presented to the ALJ contains substantial evidence supporting a finding that a claimant is disabled, the district court may reverse the Secretary's decision and enter an order granting plaintiff disability benefits. *Fillou v. Heckler*, 622 F.Supp. 346, 350 (N.D. Ill.1985).

■ Mr. Stokes does not present a sympathetic picture. It is difficult to authorize payment of government funds to someone inclined to drink them away. Nevertheless, alcoholism is now recognized as a disease, as are many types of mental health problems. Mr. Stokes qualifies for Social Security benefits, but the order which fol-

lows is an attempt at controlling the plaintiff's use of these benefits consistent with the intent of the Act.

We will condition these benefits on certain contingencies covered in the Secretary's regulations. To prevent Mr. Stokes from spending his benefits on alcohol, we direct that payments be made to a representative, either a suitable individual or an institution agreed to by counsel for the plaintiff and the government. In addition, we will condition benefits on Mr. Stokes continuing to receive treatment for alcoholism through any of the institutions mentioned in this opinion or other recognized programs. *See Purter v. Heckler*, 771 F.2d at 699, nn. 20 & 21.

An appropriate Order will issue.

## ORDER

AND NOW, to-wit, this 3rd day of July, 1990, it is ORDERED, ADJUDGED and DECREED that:

1. Plaintiff's motion for summary judgment be and hereby is GRANTED;

2. Defendant's motion for summary judgment be and hereby is DENIED;

3. Judgment be and hereby is entered in favor of plaintiff William J. Stokes and against defendant Secretary of Health and Human Services.

4. Plaintiff's disability benefit payments shall be made to a representative, either a suitable individual or an institution approved and agreed to by counsel for the plaintiff and for the defendant; and

5. Plaintiff's disability benefits are conditioned on his continuing to receive treatment for alcoholism until the time he shall be considered fully recovered.